# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48949-2021

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, May 2023 Term |
| | ) | |
| v. | ) | Opinion filed: December 20, 2023 |
| | ) | |
| TYLER REECE RAMBO, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Cynthia K. C. Meyer, District Judge.

The judgment of conviction is <u>affirmed</u>.

Erik R. Lehtinen, Interim State Appellate Public Defender, Boise, for Appellant. Jenny C. Swinford argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Mark W. Olson argued.

_____

ZAHN, Justice.

Tyler Reece Rambo appeals his judgment of conviction on three counts of aggravated assault upon a peace officer following an incident with police at a city park. Rambo challenges several of the district court's evidentiary rulings concerning the admission of evidence at his jury trial. We affirm the district court's rulings (1) excluding evidence of potential civil litigation against the Coeur d'Alene Police Department as irrelevant, (2) admitting body camera footage of Rambo's gun discharging in the direction of officers, (3) excluding body camera footage of officers returning fire as unfairly prejudicial, (4) prohibiting Rambo from testifying about the trajectory of a particular bullet because Rambo did not possess the necessary expertise to render an expert opinion, and (5) prohibiting Rambo from showing the jury his bullet scars because it was unfairly prejudicial. However, we hold that the district court erred in determining that body cam footage

indicating that Rambo's gun did not discharge a second time was irrelevant. Even so, we hold the error was harmless and affirm Rambo's judgment of conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

On July 4, 2019, Rambo attended a fireworks show at City Park in Coeur d'Alene. As the crowd dispersed after the fireworks show, Rambo encountered a group of people in the park, which included Jawaun Anderson. According to Rambo, Anderson hit him several times and Rambo fell to the ground. Anderson, and potentially other people, then "stomped" on his head and body. During the fight, Rambo pulled out a loaded revolver that he had been carrying in his waistband. Rambo allegedly pointed the gun at Anderson and Anderson's girlfriend before firing the gun into the air. Rambo and Anderson then fought over the gun. According to Rambo's account of the events, Anderson let go of the gun and told Rambo to "run." Rambo fled the scene with the gun still in his hand.

Officers in the area either heard the gunshot or heard on their radios that a gun had been discharged in the park. Officers saw a man, later identified as Rambo, running from the area of the gunshot and began pursuing him. Officers chased Rambo and yelled for him to stop running. Officers caught up to Rambo when he stopped running. A total of eight officers pursued Rambo and, when he stopped running, formed a semicircle around him.

Officers repeatedly demanded that Rambo put the gun down. After dropping a hoodie in his hand, Rambo turned around so his back was to the officers. Rambo still had the gun in his right hand and slowly walked away. After a few steps, Rambo raised both hands in the air, still with his back to the officers. He then began turning around to face the officers. As he turned, his left hand (which was empty) extended out with his palm up, and his right hand, still holding the gun, remained pointed up in the air. Rambo then dropped his right hand toward the ground and his arm formed a right angle at the elbow.

About one second later, Rambo's right hand began to tilt down so the gun barrel was parallel to the ground. One of the officers then tased Rambo. The taser prongs hit Rambo in the chest. Rambo fell backward and the gun discharged. Officers then returned fire. Rambo was shot multiple times and suffered severe injuries, resulting in the amputation of both legs at the hip.

2

**B. Procedural History**

The State initially filed an Information charging Rambo with attempted second-degree murder and aggravated assault related to Rambo's altercation with Anderson and his girlfriend and alleged that he was subject to a sentencing enhancement for the use of a deadly weapon. The State later obtained a grand jury indictment against Rambo for eight counts of aggravated assault upon a peace officer. The State moved to consolidate the two cases. The district court granted the motion, and the State thereafter filed an "Amended Information/Indictment" ("Amended Indictment").

The eight counts of aggravated assault on a peace officer used nearly identical language, except the name of the officer was different in each count, and specifically alleged that Rambo had committed the crimes by brandishing a handgun and refusing to comply with commands to drop the handgun. The following represents one of the aggravated assault charges brought against Rambo:

> That the Defendant, TYLER REECE RAMBO, on or about the 4th day of July, 2019 , [sic] in Kootenai County, Idaho, did intentionally, unlawfully, and with apparent ability threaten by an act to do violence upon the person of [officer's name], with the deadly weapon, to-wit: brandishing a handgun and refusing to comply with commands to drop the handgun, which created a well-founded fear in [officer] that such violence was imminent, and at the time of the offense [officer] was a peace officer of the State of Idaho, and TYLER REECE RAMBO knew or had reason to know that [officer] was a peace officer[.]

The State later moved to amend the indictment a second time to allege that Rambo had committed assault by attempting to fire the gun at the officers, which the district court denied. The State also sought to dismiss five of the aggravated assault counts, which the district court granted. The State then filed a second amended indictment, which included the three counts of aggravated assault on a peace officer by threat and the charges related to the altercation with Anderson and his girlfriend.

Prior to trial, the parties filed several motions in limine. First, the State moved to exclude any argument, testimony, evidence, or reference to a civil lawsuit by Rambo against the Coeur d'Alene Police Department regarding the police use of force against Rambo. The district court granted the State's motion over Rambo's objection.

Second, the State moved to exclude evidence and argument concerning the number of times officers shot Rambo, Rambo's subsequent injuries, and images of Rambo's injuries. The district court excluded evidence of how many times the officers fired their weapons. The district court

3

also provisionally excluded evidence of Rambo's injuries, including video footage. However, the district court determined Rambo could offer evidence of the officers' bullet trajectory as part of his defense, concluding that, "if circumstances warrant, [Rambo] may present the excluded evidence regarding injuries in a proffer to allow the court to reconsider the present evidentiary order."

Third, Rambo moved to exclude evidence of his gun discharging after he was tased. Rambo argued that he was charged with aggravated assault by brandishing a handgun and refusing to comply with demands to drop the handgun, so evidence of his gun discharging after the taser deployed was not relevant or was so unfairly prejudicial that it should be excluded. The district court denied the motion.

Rambo was tried before a jury. The State sought to introduce body camera footage from the officers. Following the district court's pre-trial rulings on the motions in limine, the State edited the footage to end immediately after Rambo's gun discharged. When the State sought to introduce the footage at trial, Rambo argued that the body cam footage should, as a matter of completeness and fairness, be extended to show that Rambo did not attempt to return fire after he was shot by officers. The district court denied Rambo's request to include the additional footage in the videos, but stated Rambo could question the officers on whether Rambo returned fire.

The State called numerous witnesses, including the eight officers involved in the confrontation with Rambo. The State also called the lead taser instructor for the Idaho State Police, Michael Grigg, to provide his expert opinion about the taser and what impact it had on Rambo. Grigg testified that, in his opinion, Rambo had control of his arms during the taser deployment and discharge of his gun. Grigg based this opinion on the body cam footage that depicted Rambo reaching toward the taser probe when it hit his chest and reaching back toward the ground as he fell. The State introduced the testimony to establish that, because Rambo had control of his arms, he intentionally fired his gun at officers.

After the State rested its case, Rambo again sought to introduce evidence of his injuries, specifically to testify about the trajectory of a particular bullet, which Rambo argued went through his arm and into his chest/abdomen. Rambo asserted that he could line up the bullet wounds and establish that Rambo's arm was still in front of him when he was shot, which caused him to lose control of his arm before his arm started to move toward the ground. He argued this evidence was relevant to rebut Grigg's testimony that Rambo had control of his arms during the taser

4

deployment. Rambo contended that he lost control of both arms when he was tased and that the gun discharge was unintentional. The district court ruled that Rambo would be allowed to testify that he was shot in the arm, but precluded Rambo from testifying about the bullet entry and exit wounds because that would require expert testimony.

Rambo then presented his case to the jury, during which Rambo testified that he was shot in his left arm. Rambo also called an expert witness, Jerry Staton, to testify that the taser hit caused Rambo to lose control over both of his arms prior to the gun discharge. The defense rested following Staton's testimony.

The parties then discussed rebuttal evidence, and, relevant here, the State requested to play a "25% speed" version of the body cam footage for the jury to show that a gunshot wound to Rambo's arm could not have been the cause of his arm moving behind him. The State also sought to have Detective Sudol testify concerning his observations of the 25% speed version of the body cam footage. The district court granted the State's request over Rambo's objection.

In response, Rambo again sought to introduce extended versions of the body cam footage that included the officers returning fire, to rebut the State's evidence concerning where Rambo's arm was when he was shot. Rambo also requested to testify about his experience of being shot in the arm to establish that he was shot before his arm started to move backward. The district court denied Rambo's request to introduce extended versions of the body cam footage but granted his request to testify about the experience of being shot. The district court reiterated, however, that Rambo would not be permitted to show the jury his scars from the bullet wounds.

The jury returned a not guilty verdict on the charges stemming from the altercation with Anderson but returned a guilty verdict on the three counts of aggravated assault upon a peace officer and found that Rambo was subject to the sentencing enhancement due to using, displaying, threatening, or attempting to use a deadly weapon in the commission of the crimes. The district court sentenced Rambo to a unified sentence of ten years with five years fixed and five years indeterminate on each of the counts to be served concurrently.

Rambo moved for a new trial, which the district court denied. Rambo timely appealed his conviction.

## II.    ISSUES ON APPEAL

1. Whether the district court erred by excluding evidence of Rambo's civil suit against the City and its officers.
2. Whether the district court erred by admitting evidence of Rambo's gun discharging.

3. Whether the district court erred by excluding body cam footage following Rambo's gun discharging.

4. Whether the district court erred by excluding some evidence related to Rambo's left arm injury.

## III. STANDARD OF REVIEW

This Court generally reviews a district court's decision to admit or exclude evidence under an abuse of discretion standard. *State v. Ogden*, 171 Idaho 843, 852, 526 P.3d 1013, 1022 (2023) (quoting *State v. Chambers*, 166 Idaho 837, 840, 465 P.3d 1076, 1079 (2020)). This includes the decision to admit lay or expert witness testimony. *State v. Smith*, 170 Idaho 800, 814, 516 P.3d 1071, 1085 (2022) (citation omitted). However, "[w]hether evidence is relevant is a question of law and is subject to de novo review." *State v. Leavitt*, 171 Idaho 757, 764, 525 P.3d 1150, 1157 (2023) (quoting *State v. Ochoa*, 169 Idaho 903, 912, 505 P.3d 689, 698 (2022)). Thus, "[t]he question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *Ogden*, 171 Idaho at 852, 526 P.3d at 1022 (quoting *State v. Hall*, 163 Idaho 744, 781, 419 P.3d 1042, 1079 (2018)).

To determine whether a court has abused its discretion, this Court asks "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

## IV. ANALYSIS

Rambo challenges several of the district court's evidentiary rulings and contends that these errors require us to vacate his convictions. For the reasons discussed below, we affirm the majority of the district court's rulings and determine that its one erroneous relevancy determination was harmless. Therefore, we affirm Rambo's judgment of conviction.

**A. The district court did not err in excluding evidence of Rambo's civil suit against the Coeur d'Alene Police Department.**

Nearly eight months before trial, the State filed a motion in limine seeking to exclude evidence of "[Rambo's] Civil Lawsuit (or notice of intent of lawsuit) against the Coeur d'Alene Police Department." Rambo opposed the motion. Notably, neither party introduced evidence that Rambo had filed a civil lawsuit or notice of tort claim against the Coeur d'Alene Police Department. The district court granted the State's motion and concluded that "the existence of a

6

civil lawsuit against the police officers is not relevant under I.R.E. 401 because it does not tend to show [Rambo] did or did not commit the crimes with which he is charged."

Rambo argues evidence of a civil suit was relevant to the testifying officers' credibility and argues that the district court erred in excluding the testimony because it did not correctly employ the Idaho Rule of Evidence 403 balancing test and it failed to exercise reason in rendering its decision. The State responds by noting that Rambo has failed to preserve this issue as required by Idaho Rule of Evidence 103. If the argument is preserved, the State argues that the district court did not err and, if it did, any error was harmless.

We hold that Rambo failed to preserve this issue because he failed to make an offer of proof. Idaho Rule of Evidence 103(a)(2) requires that a party claiming error related to a trial court's exclusion of evidence make an offer of proof concerning the excluded evidence:

> A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

"The purpose of this rule is to preserve a record for appeal and to enable the court to rule on the evidence's admissibility." *Kuhn v. Coldwell Banker Landmark, Inc.*, 150 Idaho 240, 251, 245 P.3d 992, 1003 (2010) (citing *State v. Joslin*, 145 Idaho 75, 82, 175 P.3d 764, 771 (2007)). The rule serves a practical purpose—if proof of the excluded evidence is not in the record on appeal, we cannot determine whether the evidence should have been admitted.

Although Rambo opposed the State's motion in limine and argued that notice of a tort claim against the city would be relevant to the credibility of the testifying officers, he failed to submit an offer of proof concerning the alleged notice of tort claim. Without an offer of proof establishing the contents and allegations of the tort claim, we cannot evaluate whether the district court erred in excluding the evidence. *See Kuhn*, 150 Idaho at 251, 245 P.3d at 1003. We, therefore, affirm the district court's decision granting the State's motion in limine.

**B. The district court did not err by admitting evidence of Rambo's gun discharging after he was tased.**

The district court denied Rambo's motion to exclude evidence of his gun discharging after he was tased. It concluded that, under Idaho Rule of Evidence 401, the evidence was relevant to whether Rambo brandished a handgun and refused to comply with demands to drop the gun, as well as evidence of the officers' well-founded fear that violence was imminent. It also concluded

that the evidence was admissible under Idaho Rule of Evidence 403 because the probative value of the firing of the weapon outweighed any unfair prejudice to Rambo.

Rambo argues the district court erred because the evidence was not relevant under Rule 401. He next argues that, even if relevant, the district court erred by not exercising reason in its analysis of whether the evidence was admissible under Rule 403. The State asserts the district court did not err, and if it did, any error was harmless.

*1. Evidence of Rambo's gun discharge was relevant under Rule 401.*

Relying on this Court's decision in *State v. Ochoa*, 169 Idaho 903, 505 P.3d 689 (2022), Rambo asserts the evidence was not relevant because it was not probative of, or material to, the State's charged acts since the State did not allege he committed aggravated assault by firing his gun at the officers. Rambo also contends the evidence was not relevant to whether the officers had a well-founded fear. The State argues that the evidence was relevant because it was probative of the elements of aggravated assault regardless of whether the charging document contained allegations about Rambo's gun discharging.

Idaho Rule of Evidence 402 states that "[r]elevant evidence is admissible unless these rules, or other rules applicable in the courts of this state, provide otherwise." "Evidence is relevant if it is probative, having 'any tendency to make a fact more or less probable' and material, being 'of consequence in determining the action.'" *State v. Ogden*, 171 Idaho 843, 857, 526 P.3d 1013, 1027 (2023) (quoting I.R.E. 401). "[W]hether an issue is relevant requires understanding those theories 'concerning the crime charged,' the elements of that crime, and the ultimate issue that the jury is asked to determine." *Id.* (quoting *State v. Garcia*, 166 Idaho 661, 671 n.3, 462 P.3d 1125, 1135 n.3 (2020)). "Whether a fact is 'of consequence' or material is determined by its relationship to the legal theories presented by the parties." *Ochoa*, 169 Idaho at 913, 505 P.3d at 699 (quoting *Garcia*, 166 Idaho at 670, 462 P.3d at 1134). "The question of whether evidence is relevant is reviewed de novo[.]" *Ogden*, 171 Idaho at 852, 526 P.3d at 1022 (quoting *State v. Hall*, 163 Idaho 744, 781, 419 P.3d 1042, 1079 (2018)).

We agree with the district court that evidence of Rambo's gun discharge was relevant to the elements of aggravated assault. Idaho Code section 18-901(b) defines an assault by threat as "[a]n intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Rambo's refusal to put the gun down and the

subsequent discharge of the gun were probative of his intent to do violence to the officers and to whether the officers had a well-founded fear that the violence was imminent. The evidence was material because it tended to support the State's theory of the case—that Rambo intentionally and unlawfully threatened the officers with imminent violence.

Rambo argues that our decision in *Ochoa* directs that the evidence was not relevant. In *Ochoa*, the defendant was charged with misdemeanor vehicular manslaughter after she pulled out into traffic and cut off the victim, causing him to crash his motorcycle. 169 Idaho at 907, 505 P.3d at 693. The victim later died from his injuries. *Id.* A subsequent toxicology report revealed methamphetamine, amphetamines, and methadone in the victim's system at the time of the crash. *Id.* The State moved to exclude evidence of the toxicology report, arguing that the evidence was not relevant because there was no evidence the drugs contributed to the cause of the collision. *Id.* On appeal, this Court determined that the toxicology report was not relevant because there was no evidence establishing the victim's drug use impaired his driving at the time of the crash. *Id.* at 914–15, 505 P.3d at 700–01. The Court concluded that allowing evidence of the toxicology report "without corroborating evidence or testimony showing the victim was actually impaired" would leave the jury to inappropriately speculate what role, if any, the drugs played in the crash. *Id.* (emphasis omitted).

Rambo misapprehends our holding in *Ochoa*. In *Ochoa* we were concerned that, without reliable scientific evidence concerning how much methamphetamine, amphetamines, and methadone the victim would have to ingest to impair his driving, the jury would be left to speculate on whether the drugs impaired the victim's driving at the time of the crash. In short, the jury did not possess the training or expertise to know whether the amount of drugs in the victim's system contributed to the crash. Unlike *Ochoa*, the jury in Rambo's case did not require specialized expertise to determine whether Rambo's actions on July 4 satisfied the elements of aggravated assault on a peace officer. Moreover, both parties presented expert witness testimony on the issue of whether Rambo had control of his arms at the time of the gun's discharge and, thus, provided the jury with information to assist in its evaluation of the gun's discharge as it related to the elements of the charged crimes. The facts of this case are distinguishable from *Ochoa*. The district court correctly determined that evidence of the gun's discharge was relevant.

9

*2. The district court did not err in concluding that the evidence was admissible under Rule 403.*

Rambo next argues that, even if evidence of the gun's discharge was relevant, it should have been excluded under Idaho Rule of Evidence 403 because the probative value of the gun discharging was substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury. Rambo argues that permitting evidence of the gun discharging led to a "trial within the trial for uncharged conduct." The State counters that evidence of the gun's discharge was highly probative and was not unfairly prejudicial.

Rule 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Therefore, Rule 403 requires balancing the probative value of the evidence with the risk that the evidence will be used for some improper purpose. *See* I.R.E. 403. Thus, even relevant evidence should be excluded "if it invites inordinate appeal to lines of reasoning outside of the evidence or emotions which are irrelevant to the decision making process." *Garcia*, 166 Idaho at 670, 462 P.3d at 1134 (quoting *State v. Rhoades*, 119 Idaho 594, 604, 809 P.2d 455, 465 (1991)). "Unfair prejudice" is prejudice that "tends to suggest a decision on an improper basis." *State v. Diaz*, 170 Idaho 79, 91, 507 P.3d 1109, 1121 (2022) (quoting *State v. Moore*, 131 Idaho 814, 819, 965 P.2d 174, 179 (1998)). The decision whether to admit relevant evidence under Rule 403 is reviewed for an abuse of discretion. *Ogden*, 171 Idaho at 857, 526 P.3d at 1027.

We conclude that the district court did not err in its decision to exclude the evidence under Rule 403. It exercised reason when it conducted its Rule 403 analysis. While the district court's explicit Rule 403 analysis is short, reading the district court's analysis concerning the relevance of the evidence under Rule 401 in conjunction with its Rule 403 analysis demonstrates that the district court exercised reason in concluding the evidence was admissible.

The district court began by rejecting Rambo's assertion that evidence of the gun discharging was not relevant to the issues being presented. The district court explained that Rambo's view was too restrictive because the gun discharging was relevant to several elements of an aggravated assault. After concluding the evidence was relevant, the district court found that "the probative value of the firing of the weapon far outweighs any possible prejudice to Mr. Rambo." The district court exercised reason in concluding that the probative value of the evidence in relation to the aggravated assault charges was not substantially outweighed by the danger that

10

the jury would convict Rambo of uncharged conduct. Accordingly, we affirm the district court's decision to admit the body cam footage of Rambo's gun discharging.

## C. The district court erred when it concluded that video evidence following Rambo's gun discharging was not relevant.

This issue encompasses two of the district court's evidentiary rulings. First, the district court granted the State's motion in limine that sought to exclude evidence of the number of times officers fired their weapons and images of Rambo's injuries. In this decision—which occurred nearly eight months before trial—the district court concluded that evidence of the officers returning fire could be relevant, but evidence of the specific number of times the officers fired their weapons was not relevant. The district court also concluded that evidence of Rambo's injuries, other than the trajectory of the bullets as they entered his body, should be excluded under Rule 403.

Second, the district court denied Rambo's motion at trial requesting that the officers' body cam footage be extended to show that the officers returned fire and that Rambo's gun did not discharge a second time. The State objected on the basis that the extended footage was irrelevant and unfairly prejudicial under Rule 403. The district court excluded the extended video evidence but did not exclude testimony that officers returned fire and that Rambo's gun did not discharge a second time after the officers returned fire. The State conceded that Rambo could elicit testimony on these facts by cross-examining the officers, which Rambo did at trial.

Rambo asserts that the district court erred in refusing to allow the extended body cam footage to be played for the jury. Rambo contends that the video evidence of the officers returning fire and Rambo's gun not discharging a second time was relevant under Rule 401 and, as a matter of fairness under Idaho Rule of Evidence 106, should have been admitted. *See* I.R.E. 106 ("If a party introduces . . . part of a . . . recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time."). The State asserts that the district court did not err, and if it did, any error was harmless.

*1. The extended video footage was relevant to Rambo's intent.*

We conclude that the extended video evidence was relevant. The fact that officers shot Rambo and Rambo's gun did not discharge a second time is probative of Rambo's intent. Much like the evidence of Rambo's gun discharge—which tended to prove Rambo's intent to commit an assault—Rambo's gun *not discharging* a second time after officers returned fire could show he did not intend to commit an assault.

Rambo has consistently disputed the State's theory that he intentionally fired his gun at the officers. Rambo's theory was that the gun discharged accidentally because he had been tased. Evidence showing that Rambo's gun did not discharge a second time, especially while he was not being tased, has a tendency to support Rambo's version of the facts. Therefore, video evidence following the discharge of Rambo's gun was also material. *See Ogden*, 171 Idaho at 857, 526 P.3d at 1027 (material evidence is that which is directed at establishing a fact of consequence).

The district court permitted Rambo to elicit testimony from officers that his gun did not discharge a second time, and that Rambo did not attempt to reach for his gun. At the same time, however, the district court excluded video evidence of these same events on relevance grounds. The video evidence was relevant for the same reason the testimony was relevant. The fact it was in video form, rather than testimonial form, did not make it any less relevant. *Cf. State v. Hokenson*, 96 Idaho 283, 286–87, 527 P.2d 487, 490–91 (1974). For these reasons, we hold that the district court erred in concluding the extended video following the gun discharge was not relevant. Because we have determined that the evidence was relevant under Rule 401, we do not address Rambo's argument that the extended footage should have been admitted under Rule 106.

2. *The district court did not conduct a Rule 403 analysis of the extended body cam footage.*

The State alternatively argued before the district court that the extended body cam footage should be excluded under Rule 403. Because the district court determined that the extended video evidence was not relevant, it did not conduct a Rule 403 balancing analysis. On appeal, the State asserts that the district court was well within its discretion to exclude, at the motion in limine stage, the extended video evidence of officers returning fire and of Rambo lying on the ground. The State appears to argue that this Court should review that analysis for an abuse of discretion.

At trial, Rambo argued for the first time that the extended video should be shown so the jury could see that Rambo's weapon did not discharge a second time. The district court denied Rambo's motion on relevance grounds and, therefore, did not conduct a Rule 403 analysis. On appeal, the State appears to argue that the district court conducted a Rule 403 analysis of this evidence at a prior time, in connection with the State's motion in limine. However, that Rule 403 analysis only considered (1) the number of times officers shot Rambo and (2) Rambo's injuries. The analysis did not weigh the probative value of the extended body cam footage *for purposes of showing the absence of a second gun discharge* against the danger of unfair prejudice. We recognize that, had the district court conducted the Rule 403 balancing test, it might have

determined that the evidence was not admissible and that we also might have affirmed that decision on appeal. However, the analysis was never done; therefore, we have nothing to review on appeal.

This Court has previously held that the exclusion of otherwise relevant evidence without conducting the analysis required by Rule 403 constitutes error by the district court. *State v. Ruiz*, 150 Idaho 469, 471, 248 P.3d 720, 722 (2010). In *Ruiz*, the State did not argue that the error was harmless and, as a result, we vacated the defendant's judgment of conviction. *Id.* In this case, however, the State does argue that any error was harmless, and we turn to that argument now.

### 3. *The district court's error was harmless.*

The State asserts that any error on this issue was harmless because the jury had already been apprised, through testimony, of the events depicted in the extended body cam footage. Thus, the State asserts that the probative force of the video evidence was minimal compared to the weight of the untainted evidence admitted at trial establishing Rambo's guilt beyond a reasonable doubt.

Rambo asserts that the error was not harmless because the video evidence provided probative value beyond what testimony could provide. Rambo points out that the State introduced all the available body cam footage despite also having the officers provide testimony, which demonstrates the independent probative force of video versus testimonial evidence.

"A defendant appealing from an objected-to, non-constitutionally-based error shall have the duty to establish that such an error occurred, at which point the State shall have the burden of demonstrating that the error is harmless beyond a reasonable doubt." *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017) (quoting *State v. Perry*, 150 Idaho 209, 222, 245 P.3d 961, 974 (2010)). "Harmless error is 'error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.'" *Garcia*, 166 Idaho at 674, 462 P.3d at 1138 (citation omitted). "This Court utilizes a two-part analysis to assess harmless error, considering: (1) '[t]he probative force of evidence untainted by error against a defendant' and (2) the weight of the untainted evidence 'against the probative force of the error itself.'" *State v. Fox*, 170 Idaho 846, 863, 517 P.3d 107, 124 (2022) (alteration in original) (quoting *Garcia*, 166 Idaho at 675, 462 P.3d at 1139). "When the effect of the error is minimal compared to the probative force of the record establishing guilt 'beyond a reasonable doubt' without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless." *Garcia*, 166 Idaho at 674, 462 P.3d at 1138 (citation omitted).

Here, when weighing the probative force of the error (excluding the extended body cam footage) against the probative force of the other, untainted evidence the jury considered, we conclude that any error in excluding the extended body cam footage was harmless. The jury considered body cam footage from seven of the officers that confronted Rambo, including slowed down versions depicting the critical moments of the alleged assault. The jury considered testimony from each of the officers. Both parties offered expert testimony regarding Rambo's actions immediately before the gun's discharge, the impact the taser had on Rambo, and whether Rambo had use of his arms when his gun discharged.

Critical here, the jury heard testimony from two of the officers that Rambo's gun did not discharge a second time. During cross-examination, Rambo's counsel asked one of the officers if Rambo's gun discharged only once and if Rambo ever attempted to shoot his gun a second time:

> [Rambo's counsel] Q: His [Rambo's] gun fired one time; correct?
>
> [Officer] A: Yes.
>
> Q: Okay. And after he hit the ground, you didn't see him try to grab at his gun or shoot again, did you?
>
> A: No.
>
> Q: You said that you used your taser before he could shoot at us; do you recall that?
>
> A: Yes.
>
> Q: He had plenty of opportunity to shoot at you, didn't he?
>
> A: He did.

A second officer testified similarly and conceded that the gun did not discharge a second time.

In comparison, the probative force of the excluded, extended body cam footage was minimal. Two of the extended body cam videos in the record depict the events following Rambo's gun discharge up to the point where officers approached Rambo while he was lying on the ground. The extended videos depict the officers returning fire, which the district court determined was inadmissible under Rule 403. We have affirmed that decision today. As the officers returned fire, the light from their flashlights cut out so it is very difficult to see Rambo falling to the ground. After the gunfire stops, an officer shines a flashlight on Rambo momentarily as he is seen rolling from his side to his back and raising his hands above his head. While the extended footage establishes that Rambo's gun did not discharge a second time, it is difficult to discern what occurred as the officers returned fire and then saw Rambo lying on the ground. As such, there is

not much more information to be gleaned from the video than from the officers' testimony that Rambo's gun did not discharge a second time.

The jury considered an abundance of evidence, including testimony that Rambo did not shoot or attempt to shoot his gun a second time. The probative force of the evidence establishing Rambo's guilt beyond a reasonable doubt, including his actions leading up to the gun's discharge and concerning the gun's discharge itself was significant. In contrast, the probative force of the extended videos demonstrating that Rambo's gun did not discharge a second time was minimal. We, therefore, conclude that any error in excluding the extended body cam footage was harmless beyond a reasonable doubt.

**D. The district court did not err in limiting Rambo's testimony concerning his gunshot wounds and the bullet's trajectory.**

The district court issued several evidentiary rulings concerning Rambo's gunshot wounds and testimony concerning the trajectory of a bullet that struck his arm. Months before trial, the district court provisionally granted the State's motion in limine to exclude evidence of Rambo's wounds. In this ruling, however, the district court recognized that evidence of the bullets' trajectories might be relevant and noted that Rambo "may present the excluded evidence regarding injuries in a proffer to allow the court to reconsider the present evidentiary order."

After the State rested its case at trial but before Rambo presented his case in chief, the parties discussed the scope of the district court's prior evidentiary rulings. Rambo argued that he should be able to introduce evidence of whether he had voluntary use of his arm at the time his gun discharged. Rambo argued that the State's expert witness, Grigg, put Rambo's arm movement at issue based on his opinion that Rambo voluntarily moved his arm back to brace himself. Rambo sought to introduce evidence that a bullet passed through his arm and into his body. Rambo argued that, if the bullet holes are lined up, they show that Rambo's arm was in front of his body when it was shot, which indicated that Rambo moved his arm down because it had been shot, not because he was voluntarily putting his arm down to brace himself. The district court reserved ruling on the issue.

Rambo began his case in chief and put on two witnesses before he called himself to testify. Following some testimony by Rambo, the district court took a break. While the jury was excused, the district court again took up Rambo's proposed bullet trajectory evidence. The State showed the district court a slowed down, 25% speed version of one officer's body cam footage and called a witness to explain how the video showed that Rambo's arm was down when officers began

15

shooting, which suggested Rambo's arm could not have been shot while it was in front of his body. The district court asked Rambo whether he had an expert who could line up the bullet entrance and exit wounds on Rambo's arm and abdomen. Rambo's counsel said that Rambo could testify to that. The district court ruled that Rambo would be allowed to testify that he was shot in the arm but would not be allowed to testify about the significance of the bullet's angle of entry and exit because that testimony would require an expert.

After the jury returned, Rambo continued with his testimony and discussed that he had been shot in the left arm. After Rambo rested his case, the parties discussed rebuttal evidence outside the presence of the jury. Relevant here, the State proposed showing the jury the slowed down, 25% speed version of the body cam footage to demonstrate that a gunshot wound to Rambo's arm could not have caused his arm to move behind him. The State also sought to have Detective Sudol, the lead detective in the case, testify about his observations of the slowed down body cam footage. The district court granted the State's motion over Rambo's objection.

In response, Rambo sought to once again introduce extended versions of the body cam footage to rebut the State's evidence. Rambo also wanted to testify about his experience of being shot in the arm. The district court denied Rambo's request to show the extended body cam footage but granted his request to testify on the experience of being shot. The district court clarified that Rambo would not be able to show his scars from the bullet wounds to the jury.

Rambo argues that the district court erred by restricting the evidence he could offer. He asserts that he should have been permitted to testify that a single bullet went through his forearm and into his body, which established where his arm was positioned when he was shot. He asserts that the district court erred when it concluded this testimony required an expert. He further argues that he should have been allowed to show extended body cam footage and his gunshot wounds to the jury to support his testimony. Rambo also maintains that the district court erred in its Rule 403 analysis because it did not exercise reason.

The State argues that the district court correctly concluded the bullet trajectory evidence required an expert. The State also asserts that evidence of Rambo's gunshot wounds and the extended body cam footage was properly excluded.

1. *The district court did not err in excluding Rambo's bullet trajectory evidence.*

Rambo asserts that his testimony regarding the bullet trajectory through his left arm and into his body was not expert testimony. He argues that the experience of being shot was within his

personal knowledge, which included experiencing a single bullet passing through his forearm and into his body.

The district court concluded that Rambo's bullet trajectory testimony required an expert to match up the entrance and exit wounds:

> My ruling will be that Mr. Rambo can testify that he got shot in the arm, in the left arm, but as to entrance/exit and going into his body cavity, he doesn't have the expertise to match those up and I'm not going to allow that. I think that's medical testimony that needs to come in in order to make that kind of a showing.

The district court later allowed Rambo to testify that he experienced being shot in the arm when his arm was in front of his body.

Drawing the line between lay and expert opinion testimony primarily turns on whether the testimony is (1) rationally based on the witness's perception (under Rule 602) and (2) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *State v. Smith*, 170 Idaho 800, 817, 516 P.3d 1071, 1088 (2022) (citations omitted).

> [U]nder Rule 701(c), there are two ends of the spectrum. First, opinion testimony is lay, and conforms to Rule 701(c), if it is based on the "usual and ordinary experience of the average person[.]" Lay opinion testimony "results from a process of reasoning familiar in everyday life," while expert opinion testimony "results from a process of reasoning which can be mastered only by specialists in the field." More precisely, "the opinion must be able to be drawn following observation by any person possessing a generally present background, i.e., common knowledge[.]"

> Second, at the other end of the spectrum, opinion testimony will run afoul of Rule 701(c) if it is "wholly scientific" or "so far removed" from the common knowledge and experience of the average person "that expert knowledge is essential to the formation of an intelligent opinion[.]" In that case, the opinion falls into Rule 702 territory and may only be admitted through an expert.

*Id.* (alterations in original) (citations omitted). In *Smith*, we explained that a lay opinion is one reached through the application of everyday reasoning or the consultation of a resource available to the average person, while an expert opinion is one reached through the application of scientific, technical, or specialized knowledge not generally known by the average person. *Id.* at 818, 516 P.3d at 1089.

Applying these distinctions to this case, we hold that the district court did not err by excluding Rambo's lay opinion concerning the trajectory of one of the bullets that hit him. Critically, the district court permitted Rambo to testify that he experienced being shot in the arm when his arm was in front of his body. The district court only prevented Rambo from opining that the bullet that entered his left arm was the same one that went into his chest/abdomen. In a colloquy

17

with the district court, Rambo's counsel explained the basis of Rambo's proposed opinion testimony:

> RAMBO'S COUNSEL: . . . And for the record, [Rambo has] scars from an entry wound, to describe as I can, on his forearm, the outside of his forearm, somewhat towards the center, maybe a little closer to his elbow. He's got the exit wound on the inside of that left forearm, and he's got the entrance wound into the side of his chest. And he's got the scars to show that, that all line up. His hand was right there when that bullet was taken.
>
> THE COURT: Do you have an expert who has lined up those bullets?
>
> [RAMBO'S COUNSEL]: No. No. You can look at it. I mean -- and he'll be testifying about it as well.
>
> . . . .
>
> [RAMBO'S COUNSEL]: . . . [T]hat bullet is going to cause some damage and clearly it does. And that's evidence tending to show that [Rambo] didn't voluntarily put his arm down.
>
> THE COURT: So you told me that you don't have an expert to testify that it is entrance/exit/entrance wound -- and I pointed to the front of my arm, the back of my arm --
>
> [RAMBO'S COUNSEL]: Uh-huh.
>
> THE COURT: -- and my abdomen.
>
> [RAMBO'S COUNSEL]: Uh-huh.
>
> THE COURT: Do you have anyone to testify about damage to his arm, a medical testimony?
>
> [RAMBO'S COUNSEL]: No.
>
> THE COURT: Do you have anyone to testify that the entrance wound is on his forearm that would line up with the back of his hand and exit wound is on the inside?
>
> [RAMBO'S COUNSEL]: I have [Rambo]'s testimony.
>
> THE COURT: Can you tell the difference?
>
> [RAMBO'S COUNSEL]: Oh, yeah. The entrance wound is substantially different than the exit wound.
>
> THE COURT: Do you have anyone to tell the jury about the difference?
>
> [RAMBO'S COUNSEL]: No, not an expert.
>
> THE COURT: Okay.

Rambo was hit by multiple bullets near or at the same time. Although Rambo claimed that he was able to accurately perceive the trajectory of one particular bullet while being hit by multiple other bullets, we agree with the district court that the opinion that Rambo claimed he could offer

was not one within the common knowledge and experience of an everyday person. Rather, the testimony requires the application of specialized medical and forensic knowledge that is not generally known by the average person. Accordingly, the district court did not err by excluding Rambo's proposed opinion testimony.

2. *The district court did not err in excluding extended body cam footage and evidence of Rambo's gunshot wounds.*

Rambo argues that the district court erred (1) in excluding extended body cam footage showing officers returning fire, which Rambo offered to dispute the State's evidence on Rambo's arm positioning; and (2) in preventing Rambo from showing his gunshot wound scars to the jury because it supported his testimony. Rambo also asserts that the district court did not conduct a Rule 403 analysis on Rambo showing his gunshot wounds to the jury.

During the parties' discussion with the district court on rebuttal evidence, the court again excluded the extended body cam footage under Rule 403 because any probative value was substantially outweighed by unfair prejudice:

> THE COURT: Okay. So with respect to the extended police videos, the answer is no for reasons that I've stated many times in the past. I think this would go far beyond any purpose that we're here dealing with at this moment. And I don't know that I agree there is zero relevance, but that any minimal relevance there is, is substantially outweighed by the danger of unfair prejudice, again, law enforcement is not on trial. The purpose to me, the overriding purpose of putting in that evidence is to engender a result that is not based on logic and reason, but that is based on sympathy and passion and prejudice. So the answer to the videos is no.
>
> With respect to Mr. Rambo testifying as to a recollection of when he was shot in a certain way, if he can, in good faith, get on the stand and state when he thinks that he was shot in the arm, at what moment in that chaotic presentation, that if he thinks he can do that and you think that you can present that in good faith, I'll allow that. But it is very limited as to when he was shot in the arm, no more.
>
> RAMBO'S COUNSEL: No showing of the scars?
>
> THE COURT: Nope.

This discussion is informed by the district court's ruling prior to trial that evidence of Rambo's injuries was excluded under Rule 403:

> [Rambo's] argument regarding his potential defense to show the projectile motion of bullets entering his body while he was falling to the ground may be relevant to the case. However, because [Rambo's] injuries are so significant, the evidence invites emotions that are irrelevant to the decision-making process.
>
> Therefore, the court finds that evidence regarding [Rambo's] injuries—except for the trajectory of police officer's bullets—is inadmissible under I.R.E.

403. Nevertheless, if circumstances warrant, [Rambo] may present the excluded evidence regarding injuries in a proffer to allow the court to reconsider the present evidentiary order.

As previously mentioned, Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "Unfair prejudice" is prejudice that "tends to suggest a decision on an improper basis." *Diaz*, 170 Idaho at 91, 507 P.3d at 1121 (quoting *Moore*, 131 Idaho at 819, 965 P.2d at 179).

The district court did not err by excluding the extended body cam footage and evidence of Rambo's gunshot wounds under Rule 403. As for the extended body cam footage, the district court exercised reason by recognizing that the extended videos had some relevancy to determining where Rambo's arm was when it was shot. However, the district court reasoned that video showing the officers shooting Rambo would constitute an improper appeal to the jurors' sympathy and inflame their passion. The district court exercised reason and acted consistently with the legal standards applicable to the issues before it. Accordingly, the district court did not err when it excluded the extended body cam footage.

Regarding Rambo's wounds, we are not persuaded by Rambo's argument that the district court failed to conduct a Rule 403 analysis weighing the probative value of showing his gunshot wounds to the jury. It is true that the district court, near the end of the trial, rejected Rambo's gunshot wound evidence without explicitly conducting a second Rule 403 analysis. However, the district court simply stood by its prior Rule 403 analysis on the issue conducted in connection with the State's pre-trial motion in limine. In that analysis, the district court concluded that any probative value was outweighed by the danger that Rambo's wounds would invite an appeal to emotion and therefore the evidence was unfairly prejudicial. Once again, the district court acted within the outer boundaries of its discretion and reached its decision by the exercise of reason. Accordingly, the district court did not err in excluding evidence of Rambo's bullet wounds.

Because the district court erred in only one of its evidentiary rulings, we do not consider Rambo's argument under the cumulative error doctrine.

## V. CONCLUSION

Rambo's judgment of conviction is affirmed. Although the district court erred in concluding that body cam footage of Rambo's gun not discharging a second time was not relevant,

20

the error was harmless. The district court did not err in its other evidentiary rulings. Accordingly, we affirm Rambo's judgment of conviction.

Chief Justice BEVAN, and Justices BRODY, STEGNER, and MOELLER CONCUR.